**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEAIRA JONES, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ERIE COUNTY MEDICAL CENTER CORPORATION,<br><br>Defendant. | Case No. ____________<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Leaira Jones ("Plaintiff"), at all times relevant herein, was a patient of Erie County Medical Center Corporation ("ECMC" or "Defendant"), and used Defendant's Website for healthcare services, including scheduling appointments, filling out forms, requesting information, logging into the patient portal, and viewing services such as looking up doctors and reviewing test results. Plaintiff brings this class action against Defendant in her individual capacity and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions, her counsel's investigation, and upon information and belief as to all other matters, as follows:

1. Plaintiff brings this class action to redress Defendant Erie County Medical Center Corporation's ("Defendant" or "ECMC") unlawful, systematic, and ongoing practice of collecting, disclosing, and monetizing patients' most sensitive healthcare information—hereinafter "Private Information"—to unauthorized commercial third parties, including Google and Meta (Facebook), without patient knowledge, authorization, or consent. (Google, Meta, and other unauthorized third parties will be collectively referred to as "Unauthorized Third-Party Marketers").

2. As used herein, "Private Information" means and includes: (i) personally identifiable information ("PII"), such as name, email address, IP address, device identifiers, and geolocation data; (ii) communications, messages, and content transmitted through Defendant's digital properties ("CMC"); and (iii) protected health information ("PHI") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations. Defendant accomplishes this unlawful scheme through the covert deployment of "Tracking Tools" embedded in its Website and patient-facing digital properties.

3. Defendant is a healthcare provider operating in New York State. Defendant is a hospital and medical center providing a comprehensive range of healthcare services. Defendant owns and operates https://www.ecmc.edu/ as its main website (the "Website").

4. Defendant designed and actively operates its Website as a marketing tool to encourage its patients and prospective patients, including Plaintiff and Class Members, to use its Website to seek healthcare services from Defendant. Specifically, Defendant offers the Website to its patients and prospective patients as a confidential means of searching for healthcare services, schedule appointments, completing intake forms, request information, pay bills, look up doctors, access patient portals, review test results, and access online health information.

5. Defendant is a HIPAA-covered healthcare entity, and thus its disclosure and use of Private Information for marketing is tightly regulated. The United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Privacy Rule, no health care provider can disclose a

patient's PHI to a third party without express written authorization. Further, no health care provider can use a patient's PHI for marketing purposes without express written authorization.

6. Plaintiff and Class Members had a reasonable expectation of privacy when utilizing the Website for healthcare services, including when searching for information about medical conditions, looking up doctors and specialists, scheduling appointments, completing forms, reviewing test results, and paying bills.

7. Defendant owed its patients, including Plaintiff and Class Members, multiple legal duties to protect the Private Information it collected and transmitted through its Website. These duties included common law, contractual, and statutory duties to protect against the disclosure and misuse of Plaintiff's and Class Members' confidential medical and healthcare communications.

8. Although Plaintiff is presently unaware of every type of pixel and tracking tool that Defendant deployed during the relevant time period, "Tracking Tools" refers to any technology that divulges confidential information to an unauthorized third-party: (1) that has not executed a HIPAA-compliant business associate agreement with Defendant; (2) for which patients did not execute a HIPAA-compliant disclosure authorization; and (3) for which patients did not execute a HIPAA-compliant marketing authorizations.

9. As used herein, the term "Tracking Tools" includes (1) Google Analytics, Google Ads Conversion Tracking, similar tools offered by Google in conjunction with its marketing products and other platforms (such as "DoubleClick" and "YouTube"); and (2) Facebook or Meta's Pixel and other "Business Tools" it provides to marketers.

10. The Tracking Tools' specific purpose is to provide website owners with the ability to acquire the raw web user data and to then transform it into a monetizable marketing commodity, just as an oil company acquires crude oil to transform it into gasoline. The Tracking Tools are

offered for "free" to companies like Defendant but require the website owner to share and disclose web users' valuable data with the Unauthorized Third-Party Marketer.

11. Through implementation of the Tracking Tools, Defendant deprived Plaintiff and Class Members of their privacy rights by: (1) surreptitiously tracking and recording Plaintiff's and Class Members' confidential communications and Private Information; (2) causing Plaintiff's and Class Members' communications to be disclosed and intercepted by Unauthorized Third-Party Marketers; (3) utilizing the Private Information for marketing purposes; (4) converting and monetizing the Private Information through various marketing tactics, which, upon information and belief, included audience building, retargeting, geo-location, and other invasive marketing tactics; (5) failing to execute HIPAA-complaint business associate agreements governing the safekeeping of patient data; and (6) failing to obtain Plaintiff's express authorization prior to sharing and using their Private Information for marketing purposes.

12. By deploying a combination of Meta Pixel and Google Tracking Tools simultaneously, Defendant maximized the scope and granularity of patient exposure. Each Tracking Tool independently transmitted Private Information to its respective Unauthorized Third-Party Marketer. Together, the Tracking Tools ensured that patient data was captured, duplicated, and monetized across multiple commercial ecosystems—amplifying the harm to each member of the Class.

13. HIPAA defines PHI as individually identifiable health information ("IIHI") that relates to a person's past, present, or future physical or mental health, the delivery of healthcare services, or payment of health care. Data is identifiable under HIPAA if it directly identifies the individual or if there is a reasonable basis it could be used to identify the individual.[1]

---

[1] 45 C.F.R. § 160.103.

14. A covered entity, like Defendant, cannot disclose a person's PHI to a third party or utilize a person's PHI for marketing purposes without express written authorization.

15. Plaintiff's and Class Members' communications with Website include and qualify as PHI because the data: (1) is related to their past, present, and/or future medical care as a patient of Defendant; and (2) was sent in combination with persistent unique identifiers from which the Plaintiff and Class Members could be reasonably associated with the data.

16. At a minimum, the information that ECMC divulged to the Unauthorized Third-Party Marketers allowed the marketers to learn that specific individuals were patients or prospective patients seeking or receiving healthcare services or treatment ("patient status"). Standing alone, disclosing the fact that an individual is being treated for or seeking medical care is a highly offensive breach of confidentiality.

17. The Tracking Technology, however, collected and disclosed far more sensitive Private Information than just Plaintiff's and putative Class Members' "patient status." The Tracking Tools were configured and implemented to collect and disclose the users' specific actions on a page (views, clicks, form submission) and included transmission of the descriptive page URLs from the pages Plaintiff and Class Members searched, viewed, and communicated. The sensitive pages tracked included but were not limited to: (a) the contact and intake form page, (b) the pages listing healthcare services, (c) the pages dedicated to specific medical conditions, (d) the pages identifying Plaintiff's and putative Class Members' doctors and specialists; and (e) payment pages.

18. Defendant is in exclusive control of the extent in which form fields were captured and disclosed, which would have revealed additional highly sensitive Private Information.

19. In combination with the disclosure of the Private Information described above, the Tracking Tools collected and disclosed unique personal identifiers, including: tracking IDs,

timestamps, Google IDs, Meta IDs, device IDs, and various data used for browser fingerprinting. While appearing anonymous, the unique identifiers are persistent and unique data points from which Google and Meta can either directly identify with their records or easily cross-reference with other expansive data sets to connect and identify the Plaintiff and Class Members with their specific website activity and Private Information.

20. Google, for example, can easily connect patient data from Defendant's Website to an individual patient's Google Account ("cid"), which is linked to the users' Google account and contains additional details about their identity. Google "stores users' logged-in identifier on non-Google websites … in its logs … Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads."[2]

21. Likewise, Meta utilized various identifiers to link user browsing behavior with s specific individual. For example, when the website user is logged into Facebook on their web browser or device, the website user's identity is revealed the user's "c_user" cookie, which contains that user's unencrypted Facebook ID and allows Meta to link the user's online communications and interactions to their individual Facebook profile.

22. Moreover, the baseline configurations on Meta and Google also collected and disclosed extensive amounts of additional user data that can be used to identify the specific user, including, but not limited to: the user's IP address, type of device, operating system, and browser

[2] *See Brown v. Google LLC*, 685 F. Supp. 3d 909 (N.D. Cal. Aug. 7, 2023) (denying summary judgment and citing internal evidence from Google employees).

details (browser fingerprinting). Consequently, with the advancement of browser fingerprinting, both companies can identify users regardless of the persistent cookies.

23. Simply put, the data Defendant disclosed via its use of Tracking Tools on the Website is personally identifiable health information and is the digital equivalent of disclosing a comprehensive patient list to Google or Meta. Indeed, the Unauthorized Third-Party Marketers each offer Tracking Tools free of charge, but the price that Defendant paid was the intercepted patient data. Effectively, Defendant traded its patient list for access to the "free" marketing tools.

24. The HIPAA rule allows for a limited data set[3] of PHI to be disclosed, provided that (1) specific direct identifiers are removed from the data set and (2) the recipient enters into a Business Associate Agreement ("BAA") promising certain safeguards. Here, the identifiers were not removed, and there was no BAA signed—so the Safe Harbor would not apply. Moreover, it is well recognized that Google and Facebook will not execute BAAs with healthcare providers related to the transmission of data from health services websites.

25. Instead of opting for a HIPAA-compliant analytics and marketing service, Defendant bartered its patients' data in exchange for free services that were never designed or intended for the receipt of patient data.

26. Indeed, the Office for Civil Rights at HHS has issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated entities") under the

---

[3] 45 C.F.R. § 164.514(e). A limited data set is protected health information that excludes the following direct identifiers of the individual or of relatives, employers, or household members of the individual: (i) Names; (ii) Postal address information, other than town or city, State and zip code; (iii) Telephone numbers; (iv) Fax numbers; (v) Electronic mail addresses: (vi) Social security numbers; (vii) Medical record numbers; (viii) Health plan beneficiary numbers; (ix)Account numbers; (x) Certificate/license numbers; (xi) Vehicle identifiers and serial numbers, including license plate numbers; (xii) Device identifiers and serial numbers; (xiii) Web Universal Resource Locators (URLs); (xiv) Internet Protocol (IP) address numbers; (xv) Biometric identifiers, including finger and voice prints; (xvi) Full face photographic images and any comparable images. 45 C.F.R. § 164.514(e)(2).

HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online Tracking Tools. The Bulletin expressly provides (in bold type) that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules." In other words, HHS has expressly stated that ECMC's implementation of Tracking Tools violated HIPAA Rules.

27. The Federal Trade Commission (FTC) has also warned hospitals and other entities that "even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule."[4]

28. In addition, state and federal wiretapping laws expressly forbid Defendant's conduct. The federal Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*, prohibits the unauthorized interception of patrons' confidential communications with medical providers like Defendant.

29. Defendant's Privacy Policy, which is hidden at the bottom of its homepage, does not prompt its users to accept this policy on its Website, nor does it prohibit users from browsing the Website if they do not consent to the terms.[5]

30. What's worse, Defendant's Website did not present Plaintiff with any cookie banner, open or obvious privacy policy, or any other method to obtain the user's consent not just to Defendant's use of these Tracking Tools but also to the use of their Private Information for marketing. The absence of any of the foregoing methods to obtain the user's consent left Plaintiff and Class Members no meaningful opportunity to understand, reject, or control the Tracking Tools

---

[4] Template Letter from U.S. Dep't Health & Hum. Servs. (July 20, 2023), https://www.hhs.gov/sites/default/files/use-online-tracking-technologies.pdf (last visited Sept. 28, 2026).

[5] *Privacy Policy*, ECMC, https://www.ecmc.edu/privacy-policy/ (last visited Sept. 24, 2026).

before they fired and transmitted their confidential and protected information. Under HIPAA guidelines, this practice is insufficient to gain the user's consent.

31. Defendant breached its common law, contractual, and statutory duties by: (1) implementing and configuring the Tracking Tools that secretly recorded and surveilled Plaintiff's and Class Members' Private Medical Communications with Defendant; (2) disclosing Plaintiff's and Class Members' Private Information to Google and Facebook without express written consent by each patient; (3) disclosing Plaintiff's and Class Members' Private Medical Information to Google without Business Associate Agreement(s); and (4) using Plaintiff's and Class Members' PHI for marketing purposes without express written consent from each patient.

32. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered numerous harms and injuries, including the invasion of their privacy, breach of the fiduciary duties owed to them, breach of the confidentiality owed to them, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information. Plaintiff and the putative Class have suffered and seek the following damages: compensatory, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), statutory damages, and in the alternative, nominal damages. Plaintiff further seeks restitution and disgorgement of profits or cost savings obtained from the improper use of the Private Information. Finally, Plaintiff seeks injunctive relief to address the ongoing violations of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

33. Plaintiff asserts the following causes of action on behalf of herself and the Class: (1) violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1); (2)

invasion of privacy; (3) breach of implied contract; (4) unjust enrichment; (5) breach of confidence; (6) negligence; and, (7) violation of the New York General Business Law ("NYGBL") § 349.

## PARTIES

34. Plaintiff Leaira Jones is a natural person and citizen of the State of New York, residing in Buffalo, New York, where she intends to remain. At all times relevant herein, Leaira Jones was a patient of Defendant who used Defendant's Website in connection with healthcare services.

35. Defendant Erie County Medical Center Corporation is a public benefit corporation organized and existing under the laws of the State of New York with its principal place of business at 462 Grider Street, Buffalo, NY 14215.

36. ECMC is a hospital and healthcare provider offering a comprehensive range of medical services, including emergency care, cancer care, and other specialized treatment.[6]

37. Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Parts 160, 162, and 164 (HIPAA)).

## JURISDICTION AND VENUE

38. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because: (i) the amount in controversy exceeds $5,000,000, exclusive of interest and costs; (ii) the proposed Class consists of more than 100 members; and (iii) at least one member of the proposed Class is a citizen of a state different from Defendant.

[6] ECMC, https://www.ecmc.edu/ (last visited Sept. 24, 2026)

39. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action asserts claims arising under the laws of the United States, including the Electronic Communications Privacy Act, 18 U.S.C. § 2511 *et seq.*

40. This Court has personal jurisdiction over Defendant because Defendant's principal place of business is located within this District, and because Defendant has systematic and continuous contacts with this District sufficient to render it at home in this forum.

41. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, and because Defendant's principal place of business is located in this District.

## COMMON FACTUAL ALLEGATIONS

### A. Duty of Confidentiality

42. A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

43. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

44. The AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including, … personal data (informational privacy) . . . .[7]

45. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of a patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. ***Disclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm***

[7] https://code-medical-ethics.ama-assn.org/ethics-opinions/privacy-health-care (last visited Sept. 24, 2026).

> ***the integrity of the patient-physician relationship***. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified.[and] ; (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about) the purpose(s) for which access would be granted.[8]

46. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. ***Physicians who collect or store patient information electronically … must: … [r]elease patient information only in keeping with ethics guidance for confidentiality and privacy.***[9]

### B. Expectation of Privacy

47. At all times when Plaintiff and Class Members provided their Private Information to Defendant, they each had a reasonable expectation that the information would remain private and that Defendant would not share their Private Information with third parties for a commercial purpose unrelated to patient care.

48. Plaintiff and Class Members would not have used Defendant's Website, would not have provided their Private Information to Defendant, and would not have paid for Defendant's healthcare services, or would have paid less for them, had they known that Defendant would disclose their Private Information to third parties.

49. A patient's web activity and Private Information includes page views of medical information, page views of specific physicians, form completions requesting a medical appointment, clicks on log in buttons for access to a patient portal, and form completions paying

---

[8] *Access to Medical Records by Data Collection Companies*, AMA CODE OF MEDICAL ETHICS, https://code-medical-ethics.ama-assn.org/ethics-opinions/access-medical-records-data-collection-companies (last visited Sept 24, 2026).
[9] *Confidentiality & Electronic Medical Records*, AMA CODE OF MEDICAL ETHICS, https://code-medical-ethics.ama-assn.org/ethics-opinions/confidentiality-electronic-medical-records (last visited Sept. 24, 2026).

a medical bill, all of which relate to the past, present, and future medical care of that individual. Moreover, that web activity when combined with unique identifiers that can connect the web activity with a specific person is PHI under HIPAA.

50. Defendant deprived Plaintiff and Class Members of their privacy rights when it intentionally, and/or recklessly, and/or negligently: (1) implemented and configured several Tracking Tools on its Website that surreptitiously tracked, surveilled, and recorded Plaintiff's and Class Members' PHI; (2) disclosed Plaintiff's and other Class Members' PHI to unauthorized third parties (*i.e.*, Google and Facebook); (3) utilized Plaintiff's and Class Members' PHI for marketing purposes; and (4) undertook this pattern of conduct without notifying Plaintiff or Class Members and without obtaining their express written consent.

51. By installing and implementing both Facebook and Google Tracking Technology, Defendant intentionally and proximately caused Plaintiff's and Class Members' PHI to be intercepted by and/or disclosed to Facebook and Google.

**C. Underlying Web Technology, Tracking Tools & Communications**

52. To understand Defendant's unlawful data-sharing practices, it is important to understand the basics of computer science and online communications.

53. Devices (computers, laptops, tablets, and smartphones) access web content through internet browsers (e.g, Google Chrome, Mozilla Firefox, Apple Safari, and Microsoft Edge).

54. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

55. Every website is comprised of markup and source code. Markup is the forward-facing portion of the website that the visitor sees and interacts with, such as images, links, forms,

and more. By contrast, source code is essentially the invisible back-end portion of the website. The website user does not see what is happening within the source code during an ordinary website visit, but the source code acts as the set of instructions that commands the website visitor's browser and causes it to take certain actions when the web page first loads or when a specified event triggers the code. The source code is the mechanism that controls how a website user's browser communicates with the website's server, and vice versa.

56. As a user interacts with a website, multiple forms of web communications are occurring in the background between the user's browser and the website's server and include, but are not limited to:

- **HTTP Requests** are electronic communications sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests (e.g., request to access a page). POST Requests are requests to send data to the server (e.g., Form Submissions);

- **POST Requests** are the standard method by which a website transmits the information a user types into an online form — such as a name, email address, or message — from the user's browser to the website's server, distinguishing it from methods that display such data openly in the page's web address.

- **HTTP Responses** are electronic communications sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data;[10]

- **Uniform Resource Locators** ("URL") which are web addresses that contain details of the HTTP Request and the user's specific search and browsing activities; and,

- **Cookies** which are small text files that are set by the website the user is visiting and establish lines of communication between the user's browser and the website server. First Party Cookies are used to store information on the client device which can later be communicated to a server or servers such as user preferences (e.g., remember log in info). Users cannot detect

[10] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

> or prevent transmissions through first-party cookies. Third-Party Cookies are set by a third-party domain such as Google and are used for targeted marketing purposes. Third-Party cookies can track the user across the web as the user searches and visits other websites.

57. A website owner, if motivated, can manipulate the HTTP Request process and allow third parties access to the user-server web communication. This interference is typically done through Tracking Technology with the intent to gather data from the user's website behavior for monetization and various marketing purposes.

58. Tracking Technology is implemented on a website by secretly embedding and configuring the tracking software into the Source Code. Once the Tracking Technology is implemented and configured in the Source Code, the Tracking Technology automatically intervenes and manipulates the HTTP web communication between the user's browser and the website server and instructs the website to send a duplicate transmission of the communication to unauthorized third-party servers, *i.e.*, Google and Facebook.

59. Here, without its patients' consent, Defendant effectively used its Source Code to commandeer and "bug" or "tap" its patients' computing devices, allowing Google, Meta, and other third parties, to listen in on all of their communications with Defendant and thereby intercept those communications, including PHI.

### D. Defendant Collected & Disclosed Private Information to Facebook Through the Meta Pixel

60. Defendant implemented and configured the Meta Pixel in the Website's Source Code with the intent to: (a) intervene in and manipulate Plaintiff's and Class Members' HTTP request communications; and (b) collect and share detailed behavioral and health-related data with Meta.

61. Defendant and Facebook collected vast amounts of Private Information about Plaintiff and the Class Members through the Meta Pixel.

62. The Meta Pixel is a small (often invisible) piece of code that can be placed in the source code of a website, emails, or digital ads for data collection purposes. The Meta Pixel is a specific type of tracking pixel that connects a web user's browsing activity directly to the Meta advertising ecosystem (Facebook and Instagram). It offers highly valuable and effective integration between the data collected on a website with advertising campaigns through Meta platforms that include Meta Business Suites and Meta Ads Manager. The primary purpose of the Meta Pixel is to force a connection between the user's device and Meta's server, so that the Defendant can monitor, surveil, and collect user activity on its Website for marketing purposes.

63. Meta offers Tracking Tools to entities like Defendant as "free" software that advertisers can easily integrate into their webpages, mobile applications, and servers thereby enabling the almost seamless implementation and configurations of pixels into the Source Code. In fact, however, access to the Meta tools is bartered in exchange for Defendant's patients' PHI.

64. By installing and implementing the Meta Pixel, Defendant caused Plaintiff's and Class Members' communications to be intercepted by and/or disclosed to Meta. As described above, once the Meta Pixel code is implemented in the Website source code, the pixel automatically intervenes with the web-user's browser and causes an unauthorized HTTP Request and Response command to the user's browser, forcing the user's browser to send Meta information about the user's visit on the Website and the user's identity.

65. The baseline configuration collected standard events including page views, links clicked, forms completed and submitted, timestamps of when the event occurred, and referrer data

(showing which page led the user to the current one). Additional custom event tracking can be added by configuring additional code.

66. When Plaintiff and Class Members visited the Website, they would only see the Markup. Behind the scenes, however, the Meta Pixel software was embedded in the Source Code and was automatically transmitting what the patient did on the webpage and effectively opening a hidden spying window for Meta into the patients' browsing behavior.

67. As a direct result of implementation and configuration of the Meta Pixel, Defendant disclosed PHI to Meta in the forms of page views, button click tracking, form download tracking, and conversion tracking that related to the past, present, and future medical care of Plaintiff and Class Members. Without discovery, Plaintiff is unable to know precisely the configuration utilized by Meta.

68. Each of these tracked and disclosed web communications are PHI because the tracked page views, clicks, and events each (1) related to the past, present, and future medical care of Plaintiff and Class Members, (2) confirmed and indicated that the user (Plaintiff and Class Members) was a patient or prospective patient at the time of the tracked web activity, and (3) were, as discussed below, identifiable with a specific user through the identifiers that were also disclosed to Meta at the same time.

69. Moreover, each of these web communications were disclosed without Plaintiff's or Class Members' express written consent and without a business associates agreement(s) ("BAA") between Defendant and Meta.

**E. Plaintiff's and Class Members' Health Data were Reasonably Identifiable Through Meta Identifiers.**

70. With each web communication between Plaintiff and Class Members and the Website's server, persistent user identifiers were disclosed to Meta. These various identifiers

would allow Meta to connect the specific patient with the activity, as well as enable cross-platform tracking and audience creation based on the health care seeking behavioral data.

71. Meta used several digital identifiers: When the website user is logged into Facebook on their web browser or device, the website user's identity is revealed via third-party cookies that work in conjunction with the Pixel. For example, the Pixel transmits the user's "c_user" cookie, which contains that user's unencrypted Facebook ID and allows Facebook to link the user's online communications and interactions to their individual Facebook profile.

72. A user's Facebook profile generally contains a wide range of demographic and other information about the user, including location, pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook ID to locate, access, and view the user's corresponding Facebook profile quickly and easily.

73. The Meta Pixel also works in combination with persistent identifiers and fb_cookies (FID) or c_user cookies to connect the specific behavioral data on the Website to individuals, where it can be further used to build user profiles and enable cross-device tracking to surveil and collect data from individuals as they search and review other website content. Information sent to Facebook was sent alongside the Plaintiff's and Class Members' Facebook ID (c_user cookie or "FID"), thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Facebook accounts and therefore their identity.

74. But the c_user cookie is not the only means by which Meta can identify a specific individual from the web communication.

75. When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies.

76. Regardless of whether a user is logged into a Facebook account, the "fr" cookie contains an encrypted Facebook ID and browser identifier. Facebook, at a minimum, uses the "fr" cookie to identify users, and this particular cookie can stay on a user's website browser for up to 90 days after the user has logged out of Facebook.

77. The cookies listed above are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook. Although Meta created these cookies, Defendant is ultimately responsible for the manner in which individual website users were identified via these cookies, and Facebook would not have received this data but for Defendant's implementation and use of the Pixel throughout its website.

78. Defendant, however, also revealed its website visitors' identities via more powerful first-party cookies such as the "_fbp" cookie that Facebook uses to identify a particular browser and user who had interacted with Defendant's website.

79. Importantly, the "_fbp" cookie is transmitted to Facebook even when the user's browser is configured to block third-party tracking cookies because, unlike the "fr" cookies and "c_user" cookie, the "_fbp" cookie functions as a first-party cookie—i.e., a cookie that was created and placed on the website by Defendant.

80. In summation, Meta, at a minimum, uses both first-party and third-party cookies to link website visitors' communications and online activity with their corresponding Facebook profiles, and because the Pixel is automatically programmed to transmit data via both first-party

and third-party cookies, patients' information and identities are revealed to Facebook even when they have disabled third-party cookies within their web browsers.

### F. Defendant Collected & Disclosed Plaintiff's and Class Members' Private Information to Google Through the Use of Google Tracking Tools.

81. Google offers Tracking Tools to entities like Defendant for "free." However, access to the Google tools is also bartered in exchange for Defendant's patients' PHI. By implementing and configuring Google Analytics, Google Ads Conversion Tracking, and DoubleClick, Defendant caused Plaintiff's and Class Members' communications to be intercepted by and/or disclosed to Google.

82. Defendant's Source Code implemented with Google Analytics, Google Tag Manager, and Google Ads Conversion Tracking manipulated the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and to send those communications to Google.

83. Google Analytics is marginally different than the Meta Pixel but essentially accomplishes the same goal: tracking what a user communicates to Defendant's Website.[11] Google Analytics records the exact page and title; and Google Ads would fire three conversion trackers marking the user as a potential patient. These transmissions also occurred contemporaneously, invisibly, and without the patient's knowledge.

84. Several different methods allow marketers and third parties to identify individual website users, but the examples below demonstrate what happens when the website user is logged into their Google account on their web browser or device. When this happens, the website user's identity is revealed via third-party cookies that work in conjunction with the Pixel. For example,

[11] Amrita Singh, Comparing Google Analytics vs Facebook Pixel, BOLTIC (Nov. 17, 2022), https://www.boltic.io/blog/google-analytics-vs-facebook-pixel (last visited August 11, 2026).

the Pixel transmits the user's CID, and allows Google to link the user's online communications and interactions to their individual Google Account.

85. Google receives at least five cookies when Defendant's website transmits information via their tracking tool:[12]

| Name | Value | Domain |
|---|---|---|
| __Secure-3PA... | rC7qMe3pxu... | .google.com |
| __Secure-3PSID | g.a000CglYV... | .google.com |
| __Secure-3PSI... | AKEyXzVoDl... | .google.com |
| __Secure-3PSI... | sidts-CjIBkldj... | .google.com |
| NID | CroDCAES7AI... | .google.com |

*Figure 1. Screenshot from Defendant's network traffic report for Google Analytics list of cookies sent out.*

86. The NID cookie, pictured above, contains an encrypted Google Account ID and browser identifier. Google, at a minimum, uses the NID cookie to identify users, and this particular cookie can stay on a user's website browser for up to 6 months to identify the user's history on the Website.[13]

87. The cookies listed in the image above are commonly referred to as third-party cookies because they were "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Google. Although Google created these cookies, Defendant is ultimately responsible for the manner in which individual Website users were identified via these cookies, and Google would not have received this data but for Defendant's implementation and use of the Pixel throughout its Website.

[12] *Id.*
[13] *Id.*

88. Defendant also revealed its Website visitors' identities via first party cookies such as the _ga cookie that google uses to identify a particular browser and a user:[14]

| | | |
|---|---|---|
| _ga | GA1.2.1765219102.1790269853 | .ecmc.edu |

*Figure 2. Screengrab from Defendant's network traffic report depicting the first party cookie _ga.*

89. Importantly, the _ga cookie is transmitted to Google even when the user's browser is configured to block third-party tracking cookies because, unlike the NID cookies and CID cookie, the _ga cookie functions as a first-party cookie—*i.e.*, a cookie that was created and placed on the Website by Defendant.

90. Another of the Google SDKs and tracking pixels that Defendant has installed on its Website is DoubleClick. DoubleClick is designed to collect information about user behavior on websites in order to improve the targeting and effectiveness of advertising campaigns. DoubleClick's tracking technologies (the "DoubleClick Tracker") automate the ad buying process and use collected data for targeted advertising initiatives.

91. Like Google Analytics, DoubleClick is incorporated into third-party websites, including Defendant's Website, by adding a small piece of JavaScript code to each page on the site. This code immediately intercepts a patient's interaction with the webpage every time the patient visits it, including what pages they visit and what they click on. The code also collects PII, such as cookies that identify specific individuals, device information, and more.

92. The DoubleClick Tracker distinguishes itself from Google Analytics in that it specifically focuses on advertising functionality. Once Google's software code collects the data, it packages the information and sends it to Google for processing. After the data has been

[14] *Id.*

processed and stored in the database, it is used to enable ad retargeting, which allows ECMC to display targeted advertisements to users on other websites based on their previous interactions with the Website.

93. Also like the Google Analytics Tracker, the DoubleClick Tracker can collect data on user interactions with a website and transmit these details to Google. These interactions may include page views, clicks, form submissions, video plays, and other custom-defined actions. While Google Analytics refers to these as "events," the DoubleClick Tracker generally tracks them as "conversions" or "activities," primarily for advertising and attribution purposes.

94. Through the DoubleClick Tracker, Google creates and assigns unique identifiers to website visitors, including through the IDE cookie and, upon information and belief, the DSID cookie. The IDE cookie is a persistent advertising identifier containing a string of numbers and letters. The IDE cookie is unique to each user's browser and is used to record user actions and measure ad effectiveness. This identifier can be associated with a user's browser or device over extended periods of time. The DSID cookie is an account-linked identifier that is set when a user is logged into a Google account. It links browsing activity on non-Google websites to the user's Google account and ensures that the user's ad personalization settings are applied and respected across non-Google sites. The cookies contain unique user identifiers that enable Google to connect user behavior across different websites, devices, and browsing sessions.

95. The DoubleClick Tracker also collects and stores IP addresses in server logs. An IP address is a globally unique numerical identifier that guides or routes communications across the Internet. Internet service providers assign IP addresses to networking devices such as modems or routers.

96. IP addresses function as the essential addressing system of the internet. Just as a telephone number routes calls to the correct household, an IP address is necessary for routing

Internet communications to the correct location. Importantly, IP addresses reveal the general geographic location of Internet users. Free online "IP lookup" services use databases that map IP addresses to geographic areas and potentially specific households, often providing information about the country, city, county, approximate coordinates, or even the internet service provider associated with the address.

97. The geolocation capability of IP addresses makes them extraordinarily valuable for digital advertising and tracking. IP addresses allow companies to target advertisements to users in specific geographic areas with over 95% accuracy and track user interactions across multiple websites, building detailed profiles of users' browsing habits tied to their location.

98. IP addresses are particularly powerful when combined with persistent identifiers like the IDE cookie. When individuals use their devices across different locations (home, work, coffee shops), each location has its own IP address. By tracking these movement patterns between different IP addresses and correlating them with a cookie, Google can build detailed profiles of individual users' daily routines and behaviors that distinguish them from others who may share the same IP address. This combination of cookies and IP address patterns allows Google to identify and track specific individuals with remarkable precision, even when multiple people share the same household or workplace network.

99. In summation, Google at a minimum, uses the NID, _ga, CID and DoubleClick cookies to link website visitors' communications and online activity with their corresponding Google Accounts, and because the tracking tools are automatically programmed to transmit data via both first-party and third-party cookies, patients' information and identities are revealed to Google even when they have disabled third-party cookies within their web browsers.

100. As a direct result, Defendant disclosed confidential communications and PHI to Google in the forms of page views and events relating to the past, present, and future medical care

of Plaintiff and Class Members. Without discovery, Plaintiff is unable to know precisely the configuration in the Google Tag Manager Container or to determine precisely what form content and fields may also have been disclosed.

101. Each of these tracked and disclosed web communications are PHI because the tracked page views, clicks, and events each (1) related to the past, present and future medical care of Plaintiff and Class Members, (2) conferred and indicated that the user (Plaintiff and Class Members) was a patient or prospective patient at the time of the tracked web activity and (3), as discussed below, the behavioral data is identifiable with a specific user through the identifiers that were also disclosed to Google and Meta at the same time.

102. Each of these web communications were disclosed without Plaintiff's or Class Members' express written consent and without a HIPAA-compliant business associate agreement governing the transfer of data between Defendant and Google, Defendant and Meta, or any downstream parties.

103. Google collected vast quantities of Plaintiff's and Class Members' Private Information via the Tracking Tools installed on Defendant's Website.

**G. Other Digital Identifiers**

104. The baseline configurations on Meta and Google also collected and disclosed extensive amounts of additional user data that can be used to identify the specific user, including, but not limited to: the user's IP address, type of device, operating system, and browser details (browser fingerprinting).

105. On information and belief, through the use of the Tracking Tools on Defendant's Website, Defendant also disclosed and otherwise assisted third parties with intercepting Plaintiff's and Class Members' IP addresses.

106. An IP address is a number that identifies the address of a device connected to the Internet.

107. IP addresses are used to identify and route communications on the Internet.

108. IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

109. Meta tracks every IP address ever associated with a Facebook user.

110. Additionally, Meta tracks IP addresses for use of targeting individual homes and their occupants with advertising.

111. As to Google, whenever a user visits a website that is running Google Analytics and Google Ad Manager, Google's software scripts on the website surreptitiously direct the user's browser to send a secret, separate message to Google's servers in California, which includes the user's IP address, the user's geolocation, information contained in Google cookies, any user-ID issued by the website to the user, and information about the browser the user is using.

112. Accordingly, Google was also likely receiving patients' communications and PHI alongside the patients' IP address.

113. In addition to these personally identifiable persistent identifiers, upon receiving information from Defendant's Website, Google and Meta also utilize a "browser-fingerprint" to personally identify consumers. A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

114. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[15]

---

[15] Yinzhi Cao, Song Li & Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features* (Network & Distributed Sys. Symp., 2017), https://www.ndss-symposium.org/wp-content/uploads/2017/09/ndss2017_02B-3_Cao_paper.pdf.

115. These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked and can provide a wide variety of data.

116. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[16]

117. The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[17] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

118. Browser-fingerprints are personal identifiers. Google Analytics and other Google tracking tools can collect browser-fingerprints from website visitors.

119. Without discovery and full disclosure of the complete source code, Plaintiff cannot identify all browser fingerprint data at issue. However, review of the available code shows full browser/OS fingerprints, and screen/viewport sizes. Upon information and belief, additional data points were likely transmitted allowing for more accurate and identifiable browser fingerprinting.

**H. Users' Journey Through the Website**

160. To add additional detail to the allegations, the following paragraphs will walk through the process of what Plaintiff and Class Members would experience when utilizing the

[16] Justin Schuh, *Building a More Private Web*, GOOGLE (Aug. 22, 2019), https://blog.google/products/chrome/building-a-more-private-web/.
[17] Chris Hauk, *What Is Browser Fingerprinting? How It Works And How To Stop It*, PIXEL PRIVACY (Apr. 11, 2024), https://www.pixelprivacy.com/resources/browser-fingerprinting.

Website, as well as showing what was happening secretly in the Source Code surveilling their activity.

### 1. *ECMC Homepage*

161. As patients enter the homepage of the site, they entered a secretive digital world that was surveilling each movement and each decision they made on the site, as reflected in the image below.




*Figure 3. Screenshot of network traffic taken from Defendant's website which shows that the Tracking Tools are actively installed and firing on Defendant's Homepage.*

162. As depicted in Figure 3, immediately upon entering the homepage, Tracking Tools are firing to capture, *inter alia*, the user's visit and page views, so Defendant, Meta, Google and other third party tracking technologies can reissue targeted advertisements to that particular user.

### 2. *ECMC's Medical Records Page*

163. As a user navigates the website, they can review a webpage containing a Medical Records "Contact Us" intake form. A prospective patient can provide their name, email address,

and phone number to request medical records and ask general questions. The page simultaneously invokes Google and Facebook Tracking Tools.




*Figure 4. Screenshot of network traffic taken from Defendant's Website, wherein the patient has clicked on the "Medical Records" tab. The right side of the screenshot evidences Meta's tracking tools, the "fr" cookie, are present on this webpage.*

164. Facebook cookies including the c_user, datr, fr, sb, and xs also fire on the contact and intake page. Thus, when a prospective patient fills out a form with their Private Information, Google and Facebook are simultaneously notified.




*Figure 5. Screenshot of user's website usage. The left side shows Defendant's Website for the intake form page. The right side shows the Request URL that was sent to Google showing the page.*

165. Both Google and Meta Tracking tools are installed and recording the form the user is researching.

166. At the very baseline, this confirms that ECMC was disclosing to Google and Meta that the user was indeed, a patient.

### 3. *Treatment and Conditions Pages*

167. Defendant's Website provides many detailed and resourceful pages for patients to review health conditions. For example, the user can review a page about Cancer Care. Upon clicking the Cancer Care page, listed in the drop-down menu under "Health Services," the user's browser automatically sends cookies to ECMC.




*Figure 6. Screenshot from user's network traffic on the ECMC's Cancer Care information page. The left side page is showing Cancer Care page, and the right side of the page is showing Facebook cookies that are triggered when the user visits this page.*

168. In addition, landing on this page sends an HTTP Request to Defendant's web server. Defendant's web server then automatically returned an HTTP Response, which loads the Markup for that particular webpage. The user only sees the markup, not Defendant's Source Code or underlying HTTP Requests and Responses operating behind the curtain of the Website. Google is now informed that the patient is considering Cancer treatment. Therefore, Google becomes aware of what treatments the user may have had or is researching. This is undoubtedly PHI.




*Figure 8. The left side of Figure 8 is a screenshot from Defendant's website wherein the patient has Cancer from the Health Services drop down menu. The right side of Figure 8 is a screenshot of network traffic taken from Defendant's Website, which shows the live transmission of the patient's communications to Google listing prior locations that the user clicked, and tagging Google Ad Services.*

169. Thus, without alerting the user, Defendant's Tracking Tools collected and sent the web communications the user made via the webpage to Meta and Google, and the images above confirm that the communications contain the user's Private Information.

170. At a minimum, this signals to ECMC, Meta, and Google that the user is a patient or prospective patient.

### *4. Searching for a Provider or Physician*

171. Google and Facebook are also alerted when the user makes a search or looks up a doctor. For example, when the user searches "strep throat" through the "Find a Doctor" feature on the homepage, this search is communicated explicitly to Google.

| Query String Parameters | View source · View URL-encoded |
|---|---|
| rcb | 11 |
| frm | 0 |
| apvc | 0 |
| auid | 766063129.1788889046 |
| dt | Team Archive - ECMC Hospital \| Buffalo, NY |
| tid | AW-721081722 |
| en | page_view |
| dl | https://www.ecmc.edu/team/?_name_search=strep%20throat |
| dr | https://www.ecmc.edu/ |
| scrsrc | www.googletagmanager.com |
| rnd | 600621767.1790944644 |
| navt | r |
| npa | 0 |

*Figure 9. Displaying payload from users' strep throat search being transmitted directly to Google through Google Tag Manager.*

172. As this scenario plays out, with thousands of users searching for and communicating information about their healthcare on Defendant's Website, the data collected from the Meta Pixel and Google Tracking Tools are then linked to both Google and Meta organization and monetization systems. Through these tools, Defendant had access to sophisticated data analytics reports that can be utilized for website optimization, profile building, and advertising campaign optimization.

## I. The Disclosure of Private Health Information to Google and Meta Violated HIPAA Regulations.

173. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

174. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d to 1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an

individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

175. The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[18]

176. The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

177. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that: (1) "[i]s created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

178. Under the HIPAA de-identification rule, in order to adequately de-identify a data set relating to healthcare services, "health information is not individually identifiable only if": (1)

---

[18] *The HIPAA Privacy Rule*, HHS.GOV (last visited Sept. 24, 2026), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed;

> a. Names;
>
> ***
>
> H. Medical record numbers;
>
> ***
>
> J. Account numbers;
>
> ***
>
> M. Device identifiers and serial numbers;
> N. Web Universal Resource Locators (URLs);
> O. Internet Protocol (IP) address numbers; … and
> R. Any other unique identifying number, characteristic, or code…; and" The covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 160.514(b)(2).

179. In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[19]

[19] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance With the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS (Nov. 26, 2012), available at

180. In its guidance for Marketing, the HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, *the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing*. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[20]

181. Here, Defendant effectively traded its patient list for access to these valuable marketing tools. And neither Plaintiff nor any Class Member provided express written consent for the use of their PHI for marketing purposes.

182. While there was not a direct sale of the patient list, by disclosing the patient status of all the users of the Website in exchange for valuable marketing tools, Defendant engaged in a bartered commercial transaction whereby its patient list was constructively and effectively sold to the world's largest marketing companies.

183. The Tracking Tools allow advertisers to optimize the delivery of ads, measure cross-device conversions, create custom audiences, and decrease advertising and marketing costs.

184. Defendant utilized the Tracking Tools on numerous sensitive pages of its Website with the intent to share and disclose Plaintiff's and Class Members' confidential web communications and behavioral data with Google and Meta.

185. Whether intentional, reckless, or negligent, the data shared with Meta and Google was PHI.

---

https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[20] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Sept. 24, 2026).

186. Upon information and belief, Defendant utilized the Tracking Tools and shared PHI with Meta and Google with the intent to maximize its marketing return on investment.

187. Upon information and belief, Defendant accessed and utilized Meta Business Suites and Ads Manager Reports to review and utilize the Meta Pixel data to refine and design its advertising strategies. These strategies were intended to monetize Plaintiff's and Class Members' data and included one or more of the following: website analytics, advertising optimization, conversion tracking, and/or email marketing.

### J. Meta Ads and Business Suites

188. The Meta Pixel does not work in isolation but connects a web user's browsing activity directly to the powerful Meta advertising ecosystem (Facebook and Instagram). It offers highly valuable and effective integration between the data collected on a website with advertising campaigns through Meta platforms that include Meta Business Suites and Meta Ads Manager.

189. After intercepting and collecting the Private Information, Meta processes the data, analyzes it, and segments and assimilates it into datasets like Core Audiences and Custom Audiences. If the Website visitor is also a Facebook user, Meta will associate the collected information with a Facebook ID that identifies their name and Facebook profile, *i.e.*, their real-world identity. A user's Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

190. In addition to the Website analytics, Meta Pixel creates value for the Defendant by providing Defendant with access to sophisticated algorithms and computer learning (AI) tools that allow Defendant to further utilize Plaintiff's and Class Members' behavioral data on the website to build highly targeted audiences. These audiences include both custom audiences and lookalike audiences.

191. A "custom audience" is used to re-target users who have previously visited a website or taken specific actions on the website. For example, if a user visited Defendant's Website and didn't request an appointment, a custom audience could be built from the data gathered from the Meta Pixel to retarget those users with specific ads to try to get them to come back to the Website to schedule an appointment.

192. A "lookalike audience" is designed with the goal of reaching new potential patients who share similar characteristics, behaviors, and demographics as the existing high value patients tracked by the Meta Pixel. In this scenario, if Defendant wanted to target potential patients for cancer or behavioral treatment, it could analyze, segment and use the data collected from patients who completed forms or requested appointments to build a lookalike audience. That audience would then be used in combination with Meta's vast ecosystem and advertising platform to get ads in front of individuals with the same or similar profiles as the current patients of Defendant.

193. The Meta Pixel further provides real-time data to Meta's algorithms, allowing for automatic optimization of ad delivery. Meta's systems use the data provided from the Meta Pixel to learn and predict which users are more likely to convert and complete a request for appointment and will automatically target those potential patients to maximize the ad spend. In other words, the powerful Meta algorithm that has been gathering data from all aspects of the Internet incorporates the patient data from the Website to place digital advertisements in front of audiences with the

greatest chance of becoming a new patient of Defendant. The per patient conversion cost is then expected to be far lower than if Defendant attempted to use less sophisticated and targeted forms of advertising like traditional media, where the ad impression cost is much higher and the cost to convert a patient is higher.

194. Defendant is in exclusive control over whether CAPI was implemented. But the availability of the Tool shows notice of the privacy concerns when utilizing the Meta Pixel. Moreover, while Defendant is in exclusive control of any audience marketing campaigns it built and utilized, the presence of targeted Facebook advertisements online indicates that Defendant was utilizing Meta Business tools to create audiences and monetize Plaintiff's and Class Members' browsing activity and Private Information collected from the Website.

195. At a minimum, Defendant disclosed sufficient Private Information from which Meta could infer Plaintiff's and Class Members' patient status.

**K. Google Ads and Marketing Platform**

196. The Google marketing tools on Defendant's Website connect a Website visitor's browsing activity directly to the powerful Google advertising ecosystem. It offers highly valuable and effective integration between the data collected on a website and advertising campaigns run through Google Ads, Google Analytics, and the broader Google Marketing Platform.[21]

197. After intercepting and collecting the Private Information, Google processes the data and, where the Website visitor is signed into a Google Account and has Ads Personalization enabled, associates that data with the visitor's real-world identity through a feature called "Google Signals." Google Signals links session data from Defendant's Website to the visitor's Google Account, which is generally linked across that individual's devices and generally contains a wide

[21] *About Customer Match*, GOOGLE ADS HELP, https://support.google.com/google-ads/answer/6379332 (last visited Sept. 24, 2026).

range of information about the user, including their name, email address, phone number, location history, YouTube activity, and search history.[22] Because a user's Google Account uniquely identifies an individual across every device on which they are signed in, Google can easily use that identity to build a unified, cross-device profile of the Website visitor's behavior, including their visits to Defendant's Website.

198. In addition to Website analytics, the Google tag creates value for Defendant by providing sophisticated algorithms and machine learning tools, run through Google Ads and Google Ads Data Manager, that allow Defendant to build targeted-advertising audiences from Plaintiff's and Class Members' behavioral data.[23]

199. At the bare minimum, Defendant disclosed sufficient Private Information from which Google could infer Plaintiff's and Class Members' patient status.

### L. Defendant's Marketing Practices Violated HIPAA Standards

200. While Plaintiff does not assert a private right of action under HIPAA, the intentional violations of the statutory duties and standards under HIPAA constitute criminal and civil acts subject to penalties imposed by 42 U.S.C. § 1320d-6. Here, Defendant knowingly implemented Tracking Tools with the intent of collecting and disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b).

201. The primary motivation and a determining factor in Defendant's collection, interception, and disclosure of Plaintiff's and Class Members' Private Information was the use of

---

[22] *Activate Google Signals for Google Analytics properties*, GOOGLE ANALYTICS HELP, https://support.google.com/analytics/answer/9445345 (last visited Sept. 24, 2026).
[23] *See supra* fn. 21; *see also About Smart Bidding*, GOOGLE ADS HELP, https://support.google.com/google-ads/answer/7065882 (last visited Sept. 24, 2026).

patient data for advertising in the absence of express written consent. Such conduct gives rise to a violation of HIPAA.

202. Moreover, there is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both." 42 U.S.C. § 1320d-6(b)(3).

**M. Defendant Was Enriched and Benefitted from the Use of The Tracking Tools and Unauthorized Disclosures to Google and Meta.**

203. Defendant's further use of Private Information after the initial interception and disclosure for marketing and revenue generation was in violation of HIPAA and an invasion of privacy.

204. In exchange for disclosing Private Information of its patients, Defendant was enriched and enhanced by advertising services and more cost-efficient marketing on its platform.

205. Upon information and belief, Defendant utilized Plaintiff's and Class Members' data that was collected through Meta and Google marketing tools to implement one or more of the following marketing tactics: website optimization, audience building, and targeted campaigns, all designed to target current and potential patients to drive more profit. Defendant directly benefited through use of the intercepted patient data it obtained, procured, and/or disclosed in the absence of express written consent.

206. By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced through further use of the unlawfully intercepted and disclosed Private Information, thereby benefitting Defendant while invading the privacy of Plaintiff and Class Members and violating their rights under federal and state law.

## N. Plaintiff's and Class Members' Private Information Had Financial Value

207. Plaintiff's data and Private Information has economic value in established marketplaces. Meta regularly uses data that it acquires to create Core and Custom Audiences, as well as Lookalike Audiences and then sells that information to advertising clients. Google has recognized the value of user data and has even instituted a pilot program in which it pays users $3 per week to track them online.

208. Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil."[24] Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only expected to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.[25]

209. The value of health data, including patient lists in particular, is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[26]

---

[24] *See, e.g.*, Vahid, *Data Is the New Oil: A Powerful Metaphor with a Catch*, MEDIUM (May 23, 2026) https://medium.com/@vhid/data-is-the-new-oil-a-powerful-metaphor-with-a-catch-35899859bcb6 (last visited Sept. 24, 2026).

[25] *See* Robert J. Shapiro, *What Your Data Is Really Worth to Facebook*, WASHINGTON MONTHLY (July 12, 2019), https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook/.

[26] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, TIME.COM (Jan. 9, 2017), https://time.com/4588104/medical-data-industry/ (last visited Sept. 24, 2026).

210. Moreover, healthcare systems commonly value the lifetime value of a patient and the value of a marketing lead and impression, as well as the value of the conversion of a new patient.

211. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[27]

212. Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information. "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[28]

213. There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig*., 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

[27] *See* Christina Farr, *Hospital Execs Say They Are Getting Flooded With Requests For Your health Data,* CNBC, https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited Sept. 24, 2026).
[28] VERO, *How to Collect Emails Addresses on Twitter* https://www.getvero.com/resources/twitter-lead-generation-cards/. (last visited Sept. 24, 2026).

214. Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

215. Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

216. Additionally, health care data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[29]

217. Data brokers obtain large volumes of consumer information without consumer knowledge to resell the data for marketing campaigns. The FTC has investigated the practices and found that "data brokers collect and store billions of data elements covering nearly every U.S. consumer."[30]

218. Data brokers combine online and offline data to market to consumers online. Data brokers combine and analyze data about consumers to make inferences about them, including sensitive inferences related to health conditions. Some data brokers have been found to store data indefinitely posing significant privacy risks.[31]

219. Data brokers do not obtain the data directly from consumers, rather they obtain it through various sources including partnerships with third party marketers that utilize tracking tools.

---

[29] Tori Taylor, *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June 30, 2021), https://www.securelink.com/blog/healthcare-data-new-prize-hackers.

[30] *FTC Recommends Congress Require the Data Broker Industry to be More Transparent and Give Consumers Greater Control Over Their Personal Information*, FTC (May 27, 2014), https://www.ftc.gov/news-events/news/press-releases/2014/05/ftc-recommends-congress-require-data-broker-industry-be-more-transparent-give-consumers-greater.

[31] *Id*.

While each data broker source may provide only a few data elements about a consumer's activities a data broker can combine the data sets to form a more detailed profile of the consumer's life.

220. In fact, the unauthorized data collection from third party trackers, tags, and pixels has resulted in a proliferation and expansion of the data broker ecosystem. The web trackers serve as pivotal components in the data broker ecosystem by facilitating the collection of online activities, preferences, and demographics. This aggregated data is then analyzed and sold to various entities interested in understanding consumer behavior and targeting specific demographics.[32]

221. The U.S. data broker market is projected to grow from $280.82 billion in 2023 to $382.16 billion in 2030. This expansion is largely driven through the data harvested from the pixels and trackers on the website.

222. As far as medical advertising, the data brokers routinely utilize the data sets to predict which consumers are most likely to use, e.g., brand name medicine, order prescriptions by mail, research medications online, or respond to pharmaceutical ads or other treatment advertisements. These predictive models are then sold and used for targeted advertising.

223. The lack of transparency in the data brokering ecosystem makes it unknown whether Meta and/or Google sold or traded any of the data they received through the Tracking Technology at issue.

224. However, it is indisputable that the data at issue given its medical data is highly valuable for segmentation and profile building.

225. Once the data is shared and disclosed to any of the Unauthorized Third-Party Marketers, the patients, Class Members, and Defendant lose control over its usage and distribution.

---

[32] ONLINE DATA PRIVACY REPORT: WEBSITE PRIVACY AND COMPLIANCE CHALLENGES (Mar. 2024), https://lokker.com/api/directus-assets/419fdf43-83ba-4dba-9821-d8eff94f956a (last visited Sept. 24, 2026)

**O. Plaintiff and Class Members' Common Experience**

226. Plaintiff and Class Members are Defendant's patients who received healthcare services from Defendant. As part of the medical services, Plaintiff and Class Members used Defendant's Website to communicate Private Information to Defendant on numerous occasions. At all times, while using the Website, Plaintiff and Class Members had an expectation of privacy that the Private Information provided to Defendant would remain private and confidential.

227. Plaintiff and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to third parties, nor did they intend for anyone other than Defendant to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

228. Plaintiff and Class Members were not aware that their Private Information would be disclosed to the Unauthorized Third-Party Marketers and that Defendant was utilizing their Private Information for marketing purposes because Defendant did not acquire their consent.

229. Plaintiff and Class Members were Facebook and/or Google users.

230. As Plaintiff and Class Members used Defendant's Website, the Website's Source Code configured with Tracking Tools sent a secret set of instructions back to the Plaintiff's and Class Members' browsers, causing the Tracking Tools to uniformly send Plaintiff's and Class Members' Private Information to the Unauthorized Third-Party Marketers.

231. Accordingly, during the same transmissions, the Website routinely provided the Unauthorized Third-Party Marketers with digital identifiers allowing the Third Parties to connect the Plaintiff and Class Members with their Private Information.

232. Furthermore, following the disclosure, Plaintiff's and Class Members' Private Information was aggregated and analyzed through the Unauthorized Third-Party Marketers

analytics tools and reports. From there, the aggregated data could be segmented and linked to specific user profiles for use in building “custom” and “lookalike audiences” and was incorporated into the Unauthorized Third-Party Marketers algorithms for other avenues of re-targeting.

233. Once released to the digital marketing ecosystem, the collected data may also be shared or combined with data broker aggregated data and profiles for additional marketing reach.

234. Upon information and belief, Defendant monetized Plaintiff and Class Members Private Information by building custom and lookalike audiences to target and re-target patients and potential patients. By utilizing the Unauthorized Third-Party Marketer’s tools, Defendant was able to save substantial marketing costs while decreasing its cost per conversion, as well as likely increasing its overall new patient conversion.

235. Without discovery, Plaintiff and Class Members are unable to know the full extent of the improper disclosure and use of their Private Information.

## P. Plaintiff’s Experiences

### *Plaintiff Leaira Jones’ Experience*

236. Plaintiff Leaira Jones is a patient of Defendant and first used the Website in 2021. She last used the Website in August 2026 when she received a reminder for an upcoming appointment.

237. She accessed Defendant’s Website on her computer and/or mobile device for healthcare services, including scheduling appointments, completing forms, requesting information related to bloodwork labs, logging into the patient portal, looking up doctors with whom she treated or was interested in treating with, and viewing test results. She also used the Website to access other patient-facing healthcare information and services.

238. During all relevant times, Plaintiff Jones had a Google and Facebook account which she was logged into on her personal devices. She believes that the Private Information she communicated via the Website was also transmitted to Google and Facebook via Defendant's use of Tracking Tools on the Website. Plaintiff used those same devices to access Defendant's Website.

239. Upon information and belief, the Private Information that Facebook and Google received from Defendant included specific facts concerning her status as a patient and her healthcare interactions with Defendant, was personally identifiable (linked to Plaintiff Jones), and was not anonymized or redacted.

240. Defendant intercepted and/or facilitated these interceptions without Plaintiff Jones' knowledge, consent, or express written authorization.

241. As a patient, Plaintiff Jones reasonably expected that her online communications with Defendant via the Website were solely between herself and Defendant and that Defendant would not transmit her Private Information to Facebook or Google for marketing purposes.

242. But for her status as Defendant's patient, Plaintiff Jones would not have disclosed her Private Information to Defendant or used its Website.

243. When Plaintiff Jones used the Website, her Facebook ID, IP address, device IDs and other personal identifiers were sent to Facebook and Google alongside the substance of her communications.[33]

244. Following her use of the Website, Plaintiff observed targeted advertisements from Defendant on her Facebook, Instagram and elsewhere around the internet. The presence of these

[33] Put simply, if the Website visitor is a Facebook user who is logged into their Facebook account, then Facebook will associate the information they provided with their Facebook Profile ID, which allows Facebook to locate, access, and view a wide range of information about the user, and connect that with the user's Web browsing activity..

targeted advertisements confirms Defendant's unlawful transmission of Plaintiff Jones' Private Information to third parties.

245. In sum, Defendant's Tracking Tools transmitted Plaintiff Jones' highly sensitive communications and Private Information to Facebook and Google, including communications that contained private and confidential information, without Plaintiff's knowledge, consent, or express written authorization.

246. By doing so without Plaintiff's consent, Defendant breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed Plaintiff's Private Information.

247. Upon information and belief, as a "redundant" measure to ensure Plaintiff Jones' and Class Members' Private Information was successfully transmitted to third parties like Facebook and Google, Defendant implemented server-based workarounds like Conversions API to send Plaintiff Jones' and Class Members' Private Information from electronic storage on Defendant's server directly to Facebook.

248. Plaintiff suffered injuries in the form of (i) invasion of privacy; (ii) diminution of value of the Private Information; (iii) statutory damages; (iv) the continued and ongoing risk to her Private Information; and (v) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff's healthcare services, medical information, and other confidential information she communicated to Defendant via the Website.

249. Plaintiff has a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

**Q. Class Wide Injuries, Damages, and Remedies**

250. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered numerous harms and injuries, including invasion of privacy, breach of

fiduciary duty, breach of confidentiality, loss of control of their Private Information, misappropriation of their Private Information, conversion of their Private Information, and the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

251. Consequently, Plaintiff individually and on behalf of the putative Class, brings this class action for legal and equitable remedies to address and rectify the illegal and tortious conduct and actions described herein. Plaintiff and the putative Class have suffered significant damages and seek the following remedies:

a. Compensatory damages;

b. Loss of benefit of the bargain;

c. Conversion (FMV value of the use of the data for marketing);

d. Statutory damages;

e. Nominal damages, in the alternative;

f. Consequential and future damages for reasonable and necessary data monitoring services including data broker and dark web monitoring, as well as the cost of removing the disclosed data and profiles from data broker networks;

g. Restitution for the FMV of the misuse of the Private Information;

h. Disgorgement of profits or cost savings derived from misuse of Plaintiff's and Class Members' Private Information;

i. Injunctive relief to address the ongoing invasion of privacy and financial harm derived from the continued disclosure, interception, and misuse of their Private Information.

252. The injunctive relief sought includes:

a. Removal of the Tracking Tools from sensitive parts of the Website;

b. Deletion of all analytics data collected through the Tracking Tools that includes Private Information;

c. Deletion of all audience profiles and campaigns built from data gathered through the Tracking Tools and from Plaintiff's and Class Members' Private Information;

d. Deletion of Plaintiff's and Class Member data from all identifiable third-party broker lists;

e. Enjoining Defendant from utilizing any of the Tracking Tools at issue in this matter in the future on any sensitive Website pages.

f. Enjoining Defendant from utilizing any other Tracking Technology or marketing services without first obtaining HIPAA compliance patient consent and BAA agreements with third parties.

g. Other relief as ordered by the Court.

## TOLLING

253. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know (and had no way of knowing) that her PII and PHI was intercepted and unlawfully disclosed to Meta and Google because Defendant kept this information secret.

## CLASS ACTION ALLEGATIONS

254. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

255. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States whose Private Information was disclosed to a third party without authorization or consent through the Tracking Tools on Defendant's Website.

256. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

257. Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

258. Numerosity, Fed R. Civ. P. 23(a)(1). The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI have been improperly disclosed to Google and Facebook, and the Class is identifiable within Defendant's records.

259. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiff and Class Members;

b. Whether Defendant had duties not to disclose the Private Information of Plaintiff and Class Members to unauthorized third parties;

c. Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

d. Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

e. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

f. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiff and Class Members;

g. Whether Defendant violated the consumer protection statutes asserted as claims in this Complaint;

h. Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; and

i. Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

260. Typicality, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's incorporation of Tracking Tools, due to Defendant's misfeasance.

261. Adequacy, Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

262. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action

treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

263. Policies Generally Applicable to the Class. Fed. R. Civ. P. 23(b)(2). This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

264. The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that

experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

265. The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

266. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

267. Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

268. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

269. Issue Certification. Fed. R. Civ. P. 23(c)(4). Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

a. Whether Defendant owed a legal duty to not disclose Plaintiff's and Class Members' Private Information;

b. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

e. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

270. Plaintiff reserves the right to amend or modify the Class definition as this case progresses.

**<u>COUNT I</u>**
**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1) *et seq*.**
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
**(On Behalf of Plaintiff and the Class)**

271. Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

272. The ECPA protects both sending and receipt of communications.

273. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

274. The transmissions of Plaintiff's Private Information to Defendant via Defendant's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

275. The transmissions of Plaintiff's Private Information to medical professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

276. **Electronic Communications**. The transmission of Private Information between Plaintiff and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

277. **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

278. **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

279. **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiff's and Class Members' browsers;

b. Plaintiff's and Class Members' computing devices;

c. Defendant's webservers; and

d. The Pixel deployed by Defendant to effectuate the sending and acquisition of patient communications.

280. By utilizing and embedding Tracking Pixels on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

281. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Tracking Tools, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Private Information to Meta and Google.

282. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff's and Class Members' regarding PII and PHI, treatment, medication, appointments, and scheduling.

283. By intentionally disclosing or endeavoring to disclose the electronic communications of the Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

284. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

285. **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State.

286. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixel and Conversions API to track and utilize Plaintiff's and Class Members' Private Information for financial gain.

287. Defendant was not acting under color of law to intercept Plaintiff's and the Class Members' wire or electronic communications.

288. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's privacy via the Tracking Tools code.

289. Any purported consent that Defendant received from Plaintiff and Class Members was not valid.

290. In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious and designed to violate federal and state legal provisions.

## COUNT II
## INVASION OF PRIVACY
## (On Behalf of Plaintiff and the Class)

291. Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

292. The Private Information of Plaintiff and Class Members consists of private and confidential facts and information that were never intended to be shared beyond private communications.

293. Plaintiff and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

294. Defendant owed a duty to Plaintiff and Class Members to keep their Private Information confidential.

295. Defendant's unauthorized disclosure of Plaintiff's and Class Members' Private Information to Meta and Google is highly offensive to a reasonable person.

296. Defendant's willful and intentional disclosure of Plaintiff's and Class Members' Private Information constitutes an intentional interference with Plaintiff's and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

297. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class Members' privacy because Defendant facilitated Meta and Google's simultaneous eavesdropping and wiretapping of confidential communications.

298. Defendant failed to protect Plaintiff's and Class Members' Private Information and acted knowingly when it installed the Tracking Tools onto its Website because the purpose of the Tracking Tools is to track and disseminate individuals' communications with the Website for the purpose of marketing and advertising.

299. Because Defendant intentionally and willfully incorporated the Tracking Tools into its Website and encouraged patients to use that Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiff and Class Members.

300. As a proximate result of Defendant's acts and omissions, the private and sensitive PII and PHI of Plaintiff and the Class Members were disclosed to a third party without authorization, causing Plaintiff and the Class to suffer damages.

301. Plaintiff, on behalf of herself and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs.

302. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendant and still in the possession of Meta and Google and the wrongful disclosure of the information cannot be undone.

303. Plaintiff and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Facebook, which upon information and belief, continues to possess and utilize that information.

304. Plaintiff, on behalf of herself and Class Members, further seeks injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiff's and Class Members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

## COUNT III
## BREACH OF IMPLIED CONTRACT
## (On behalf of Plaintiff and the Class)

305. Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

306. As a condition of utilizing Defendant's Website and receiving services from Defendant's healthcare facilities and professionals, Plaintiff and the Class Members provided their Private Information.

307. When Plaintiff and Class Members provided their Private Information to Defendant, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information or use it for non-medical purposes without consent.

308. Plaintiff and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to maintain the confidentiality and limited scope of use.

309. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Private Information to the Unauthorized Third-Party Marketers without consent.

310. Defendant further breached the implied contracts by using Plaintiff's and Class Members' Private Information without consent.

311. As a direct and proximate result of Defendant's breach of these implied contracts, Plaintiff and Class Members sustained numerous injuries including but not limited to the loss of the benefit of their bargain, invasion of privacy, loss of control of their Private Information, misappropriation and misuse of their Private Information, breach of confidentiality, conversion, and the ongoing financial and privacy harms derived from the continued disclosure, interception, and misuse of their Private Information.

312. Consequently, Plaintiff, individually and on behalf of the putative Class seeks legal and equitable remedies to address and rectify the breach of implied contract described herein including compensatory and consequential damages, loss of benefit of the bargain, conversion (FMV value of the use of the data for marketing), and, in the alternative, nominal damages.

Plaintiff further seeks restitution, and disgorgement of profits or cost savings obtained from breach and the improper use of the Private Information. Finally, Plaintiff seeks injunctive relief to prevent the ongoing disclosure, interception, and continued misuse of the Private Information.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Class)**

313. Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

314. Defendant benefits from the use of Plaintiff's and Class Members' Private Information and unjustly retained those benefits at their expense.

315. Plaintiff and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiff and Class Members, without authorization and proper compensation to exceed the limited authorization and access to that information which was given to Defendant.

316. Defendant exceeded any authorization given and instead consciously disclosed, misappropriated, and misused the Private Information for marketing and its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary savings and revenue.

317. Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class Members, all without providing any commensurate compensation to Plaintiff and Class Members for the use of the Private Information.

318. The financial benefits that Defendant derived from Plaintiff and Class Members were not offered by Plaintiff and Class Members gratuitously and rightly belong to Plaintiff and

Class Members. It would be against equity and good conscience for Defendant to be permitted to retain any of the savings, profit or other financial benefits wrongly derived from the misappropriation and misuse of Plaintiff's and Class Members' Private Information as alleged in this Complaint.

319. Consequently, due to the unjust nature of Defendant's actions and the injuries and damages sustained by Plaintiff and the Class, Defendant should be compelled to disgorge into a common fund all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper. These equitable funds can be evenly allocated among the Plaintiff and Class Members on a *pro-rata* basis.

320. Alternatively, Defendant should be compelled to provide restitution to Plaintiff and Class for the fair market value of the Private Information that Defendant misappropriated and misused for marketing purposes without consent.

321. Further, Plaintiff seeks injunctive relief to prevent the imminent financial and privacy harms arising from the ongoing disclosure, interception, and misuse of Plaintiff's and Class Members' Private Information.

## COUNT V
## BREACH OF CONFIDENCE
## (On behalf of Plaintiff and the Class)

322. Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

323. Medical providers have a duty to their patients to keep non-public medical information completely confidential.

324. Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged via Defendant's Website.

325. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Pixel and Conversions API to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

326. These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

327. The third-party recipients included, but may not be limited to, Facebook.

328. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

329. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class Members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Plaintiff and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a jury;

e. Nominal damages for each independent violation;

f. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h. Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

330. Defendant's actions violated the property rights Plaintiff and Class Members have in their Private Information.

**COUNT VI**
**NEGLIGENCE**
**(On behalf of Plaintiff and Class Members)**

331. Plaintiff repeats the allegations contained in the preceding paragraphs as if fully set forth herein and brings this Count individually and on behalf of the proposed Class.

332. Defendant owed Plaintiff and Class Members a duty to keep their Private Information completely, confidential and to safeguard sensitive personal and medical information.

333. Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

334. Contrary to its duties as a medical provider and its express promises of confidentiality, Defendant installed its Tracking Tools to disclose and transmit to third parties Plaintiff's and Class Members' communications with Defendant, including Private Information and the contents of such information.

335. These disclosures were made without Plaintiff's or Class Members' knowledge, consent, or authorization, and were unprivileged.

336. The third-party recipients included, but may not be limited to, Meta and/or Google.

337. As a direct and proximate cause of Defendant's unauthorized disclosure of patients', personally identifiable, non-public medical information, and communications. Plaintiff and Class Members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b. Plaintiff and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a Jury;

e. Nominal damages for each independent violation;

f. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h. Defendant's actions diminished the value of Plaintiff's and Class Members' Private Information; and

i. Defendant's actions violated the property rights Plaintiff and Class Members have

in their Private Information.

## COUNT VII
## VIOLATIONS OF THE NEW YORK CONSUMER LAW FOR DECEPTIVE ACTS AND PRACTICES GEN. BUS. LAW § 349
## (On behalf of Plaintiff and the Class)

324. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein and bring this Count individually and on behalf of the proposed Class.

325. This cause of action is brought pursuant to the New York General Business Law § 349 ("NYGBL"), which New York courts have invariably interpreted using the kind of liberal construction afforded to state consumer protection statutes intended to prevent fraud.

326. NYGBL § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New York.

327. By reason of the conduct alleged herein, Defendant engaged in unlawful practices within the meaning of NYGBL § 349. The conduct alleged herein is a "business practice" within the meaning of NYGBL § 349, and the deception occurred within New York State.

328. By serving as Plaintiff's and Class Members' healthcare provider, Defendant had a duty to protect their Private Information from unlawful disclosure.

329. Plaintiff and the Class Members paid for or otherwise availed themselves and received services from Defendant, for the purpose of medical treatment.

330. Defendant engaged in the conduct alleged in this Class Action Complaint, entering into transactions intended to result, and which did result, in the provision of medical treatment and healthcare services to Plaintiff and Class Members.

331. Defendant's acts, practices, and omissions were done in the course of Defendant's offer of medical treatment, services, and care throughout the state of New York.

332. The unfair, unconscionable, and unlawful acts and practices of Defendant alleged herein, and in particular the decisions regarding the Tracking Tools emanated and arose within the state of New York, within the scope of NYGBL § 349.

333. Defendant, operating in and out of New York, engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of NYGBL § 349, including but not limited to the following: (a) knowingly promising to protect Plaintiff's and Class Members' Private Information, (b) knowingly and improperly storing, possessing, using, and/or procuring the interception of, Plaintiff's and Class Members' Private Information; and (c) knowingly disclosing Plaintiff's and Class Members' Private Information to third parties, including Facebook.

334. Defendant committed these acts while concurrently representing that it would protect and not unlawfully disclose Plaintiff's and Class Members' Private Information unless under a legal obligation to do so.

335. These unfair, unconscionable, and unlawful acts and practices violated duties imposed by laws, including but not limited to HIPAA, the New York Patient's Bill of Rights, New York computer crime statutes, statutes regarding the confidentiality of medical records, and NYGBL § 349.

336. Defendant knew or should have known that its Website and the cookies and source code thereon were unlawfully wiretapping, intercepting, and disclosing Plaintiff's and Class Members' Private Information.

337. Plaintiff has standing to pursue this claim because as a direct and proximate result of Defendant's violations of NYGBL § 349. Plaintiff and Class Members have been "aggrieved"

by a violation of NYGBL § 349 and bring this action to obtain a declaratory judgment that Defendant's acts or practices violate NYGBL § 349.

338. Plaintiff also has standing to pursue this claim because, as a direct result of Defendant's knowing violation of NYGBL § 349, Plaintiff and Class Members have lost money or property in the form of monies paid for Defendant's services, diminution in value of their Private Information, as well as loss of the benefit of their bargain with Defendant.

339. Plaintiff and Class Members are entitled to injunctive relief to protect them from the substantial and imminent risk of future loss of Private Information, including, but not limited to: (a) ordering that Defendant immediately remove any pixel, web beacon, cookie, or other tracking technology that causes the disclosure of Private Information to third parties without consent; (b) ordering that Defendant engage third-party security auditors and internal personnel to ensure Plaintiff's and Class Members' Private Information is no longer subject to the unlawful practices described in this Complaint; (c) ordering that Defendant purge, delete, and destroy Private Information not necessary for its provisions of services in a reasonably secure manner; (d) ordering that Defendant conduct regular database scans and security checks; (e) ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to properly handle Private Information provided via Defendant's Website; (f) ordering Defendant to meaningfully educate individuals about the threats they face as a result of the loss of their Private Information to third parties, as well as the steps victims should take to protect themselves.

340. Plaintiff brings this action on behalf of themselves and Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to

protect Plaintiff, Class Members, and the public from Defendant's unfair methods of competition and unfair, unconscionable, and unlawful practices. Defendant's wrongful conduct as alleged in this Class Action Complaint has had widespread impact on the public at large.

341. The above unfair, unconscionable, and unlawful practices and acts by Defendant were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

342. Defendant's actions and inactions in engaging in the unfair, unconscionable, and unlawful practices described herein were negligent, knowing and willful, and/or wanton and reckless.

343. Plaintiff and seek relief under NYGBL § 349, including, but not limited to, a declaratory judgment that Defendant's actions and/or practices violate NYGBL § 349; injunctive relief enjoining Defendant, their employees, parents, subsidiaries, affiliates, executives, and agents from continuing to violate NYGBL § 349 as described above.

344. Plaintiff and Class Members are also entitled to recover actual damages, to recover the costs of this action (including reasonable attorneys' fees), and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Class and appointing Plaintiff and Counsel to represent such Class;

B. For an award of damages, including, but not limited to, past and future compensatory, actual, consequential, statutory, and nominal damages, as allowed by law in an amount to be determined;

C. For equitable relief in the form of restitution and disgorgement of profits;

D. For injunctive relief requested by Plaintiff, including, but not limited to:

i. Removal of the Tracking Tools from sensitive parts of the Website;

ii. Deletion of all analytics data collected through the Tracking Tools;

iii. Deletion of all audience profiles and campaigns built utilizing data gathered from the Tracking Tools;

iv. Deletion of Plaintiff's and Class Member data from all identifiable third-party broker lists;

v. Enjoinment from utilizing any of the Tracking Tools at issue in this matter in the future.

vi. Enjoinment from utilizing any other Tracking Technology or marketing services without first obtaining HIPAA compliance patient consent and BAA agreements with the third parties.

vii. Other injunctive relief as ordered by the Court.

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Dated: October 5, 2026

Respectfully submitted,

*/s/ Andrew J. Shamis*
Andrew J. Shamis
**SHAMIS & GENTILE, P.A.**
14 NE 1st Avenue, Suite 705
Miami, FL 33132
Tel: (305) 479-2299
E: ashamis@shamisgentile.com

Randi Kassan
**MILBERG PLLC**
100 Garden City Plaza, Suite 408
Garden City, NY 11530
T: 516-741-5600
Rkassan@milberg.com

*Counsel for Plaintiff and the Putative Class*